# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ALL EUROPEAN AUTO SUPPLY, INC.,
individually and on behalf of a class of all others
similarly situated,

                    Plaintiff,

v.

DENSO CORPORATION, DENSO
INTERNATIONAL AMERICA, INC., DENSO
PRODUCTS AND SERVICES AMERICAS, INC.,
DENSO INTERNATIONAL KOREA
CORPORATION, DIAMOND ELECTRIC MFG.
CO., LTD., DIAMOND ELECTRIC MFG.
CORPORATION, HITACHI, LTD., HITACHI
AUTOMOTIVE SYSTEMS, LTD., HITACHI
AUTOMOTIVE SYSTEMS AMERICAS, INC.,
MITSUBISHI ELECTRIC CORPORATION,
MITSUBISHI ELECTRIC US HOLDINGS, INC.,
and MITSUBISHI ELECTRIC AUTOMOTIVE
AMERICA, INC.,

                    Defendants.

Case No. _____

## CLASS ACTION COMPLAINT

Plaintiff All European Auto Supply, Inc. ("Plaintiff"), individually and on behalf of the

proposed class of direct purchasers of Ignition Coils (as defined below), brings this action

against Defendants DENSO Corporation, DENSO International America, Inc., DENSO Products

and Services Americas, Inc., DENSO International Korea Corporation, Diamond Electric Mfg.

Co., Ltd., Diamond Electric Mfg. Corporation, Mitsubishi Electric Corporation, Mitsubishi

Electric US Holdings, Inc., Mitsubishi Electric Automotive America, Inc., Hitachi, Ltd., Hitachi

Automotive Systems, Ltd., Hitachi Automotive Systems Americas, Inc.. (collectively,

"Defendants"), and other unnamed co-conspirators, for damages under the antitrust laws of the United States and demands a jury trial, and, upon personal information as to the facts pertaining to itself and upon information and belief as to all other matters, hereby alleges as follows:

## INTRODUCTION

1.     The United States Department of Justice (the "DOJ"), in conjunction with various domestic and foreign governmental agencies, is currently conducting an investigation into the automotive parts industry that one DOJ official described as "**appear[ing] to be the biggest criminal antitrust investigation that we've ever encountered**."  The DOJ's investigation encompasses a wide array of automotive parts and has already yielded billions of dollars in criminal fines as well as dozens of prison sentences.

2.     Some of the parts being investigated include "Ignition Coils."  These devices are part of a fuel ignition system and release electric energy suddenly to ignite a fuel mixture.

3.     Defendants are competing manufacturers of Ignition Coils sold throughout the United States, or installed in motor vehicles manufactured or sold throughout the United States, that, together with their as-yet unknown co-conspirators, entered into an agreement, combination, or conspiracy to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for Ignition Coils.  This agreement, combination, or conspiracy constituted an unreasonable restraint of interstate trade and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

4.     Defendants Diamond Electric Mfg. Co., Ltd., Hitachi Automotive Systems, Ltd. and Mitsubishi Electric Corporation have already pled guilty to participating in a conspiracy to rig bids for, and to fix stabilize, and maintain the prices of, Ignition Coils in violation of the Sherman Act.  Diamond Electric Mfg. Co., Ltd. has agreed to pay a $19 million fine for its role

2

in a conspiracy to fix prices of Ignition Coils.  Hitachi Automotive Systems, Ltd. and Mitsubishi Electric Corporation have agreed to pay fines of $195 million and $190 million, respectively, for their participation in a conspiracy for Ignition Coils as well as other automotive parts.  In addition, Defendant DENSO Corporation has already pled guilty to participating in a similar conspiracy involving various other automotive parts in violation of the Sherman Act and agreed to pay a fine of $78 million.

5.      According to the DOJ, this is the first case in its automotive parts investigation involving parts sold directly to an automobile manufacturer headquartered in the United States, Ford Motor Company.  (The conspiracy targeted various other automobile manufacturers as well.)

6.      As a direct and foreseeable result of the unlawful and anticompetitive conduct alleged herein, Plaintiff and others like it paid artificially inflated prices for Ignition Coils during the period starting at least as early as January 1, 2000 and continuing to the present (the "Class Period").

7.      Plaintiff seeks to represent a class of direct purchasers consisting of all persons and entities who, during the Class Period, purchased Ignition Coils in the United States from one or more of the Defendants or their co-conspirators.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action to obtain injunctive relief and to recover treble damages, costs of suit, and reasonable expenses and attorneys' fees, resulting from Defendants' violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.      The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

3

10.     The Court has personal jurisdiction over each of the Defendants as each of them, either directly or through the ownership or control of their United States subsidiaries, (a) resides in this District, (b) transacted business throughout the United States, including in this District, (c) sold or marketed substantial quantities of Ignition Coils throughout the United States, including in this District, (d) committed overt acts in furtherance of the conspiracy alleged herein in the United States, including in this District, (e) was engaged in a conspiracy that was directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities throughout the United States, including in this District, or (f) had substantial aggregate contacts with the United States as a whole, including in this District.

11.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, one or more of the Defendants reside in this District, and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

## PARTIES

### Plaintiff

12.     All European Auto Supply, Inc. ("AEAS") is a Michigan corporation with its principal place of business in Royal Oak, Michigan.  AEAS purchased Ignition Coils directly from one or more of the Defendants and/or their co-conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

4

## Defendants

**The DENSO Defendants**

13.     Defendant DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.  DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.

14.     Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  DENSO International America, Inc., a wholly owned subsidiary of Defendant DENSO Corporation, manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

15.     Defendant DENSO Products and Services Americas, Inc. (f/k/a DENSO Sales California, Inc.) is a corporation with its principal place of business in Long Beach, California. DENSO Products and Services Americas, Inc., a wholly owned subsidiary of Defendant DENSO Corporation, manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

16.     Defendant DENSO International Korea Corporation is a Korean corporation with its principal place of business in Uiwang-si, South Korea.   DENSO International Korea Corporation, a wholly owned subsidiary of Defendant DENSO Corporation, manufactured,

5

marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

17.     Defendants DENSO Corporation, DENSO International America, Inc., DENSO Products and Services Americas, Inc., and DENSO International Korea Corporation are collectively referred to herein as "DENSO" or the "DENSO Defendants."

**The Diamond Defendants**

18.     Defendant Diamond Electric Mfg. Co., Ltd. is a Japanese corporation with its principal place of business in Osaka, Japan.  Diamond Electric Mfg. Co., Ltd.  – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.

19.     Defendant Diamond Electric Mfg. Corporation is a Michigan corporation with its principal place of business in Dundee, Michigan.  Diamond Electric Mfg. Corporation, a wholly owned subsidiary of Defendant Diamond Electric Mfg. Co., Ltd., manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

20.     Defendants Diamond Electric Mfg. Co., Ltd. and Diamond Electric Mfg. Corporation are collectively referred to herein as "Diamond" or the "Diamond Defendants."

**The Hitachi Defendants**

21.     Defendant Hitachi, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Hitachi, Ltd. – directly and/or through its subsidiaries, which it

6

wholly owned and/or controlled – manufactured, marketed and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.

22.     Defendant Hitachi Automotive Systems, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Hitachi Automotive Systems, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.

23.     Defendant Hitachi Automotive Systems Americas, Inc. is a Delaware corporation with its principal place of business in Harrodsburg, Kentucky.  Hitachi Automotive Systems Americas, Inc., a wholly owned subsidiary of Defendant Hitachi Automotive Systems, Ltd., manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

24.     Defendants Hitachi, Ltd., Hitachi Automotive Systems, Ltd. and Hitachi Automotive Systems Americas, Inc. are collectively referred to herein as "Hitachi" or the "Hitachi Defendants."

**The Mitsubishi Defendants**

25.     Defendant Mitsubishi Electric Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  Mitsubishi Electric Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.

26.     Defendant Mitsubishi Electric US Holdings, Inc. is a Delaware corporation with its principal place of business in Cypress, California.  Mitsubishi Electric US Holdings, Inc., a wholly owned subsidiary of Defendant Mitsubishi Electric Corporation, is the parent company of Mitsubishi Electric Automotive America, Inc.  Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiary, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, the activities of Mitsubishi Electric US Holdings, Inc. and its subsidiary were under the control and direction of Mitsubishi Electric Corporation.

27.     Defendant Mitsubishi Electric Automotive America, Inc. is a Delaware corporation with its principal place of business in Mason, Ohio.  Mitsubishi Electric Automotive America, Inc., a wholly owned subsidiary of Defendant Mitsubishi Electric US Holdings, Inc., manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company, Mitsubishi Electric US Holdings, Inc., and/or the direction of its parent's parent company, Mitsubishi Electric Corporation.

28.     Defendants Mitsubishi Electric Corporation, Mitsubishi Electric US Holdings, Inc., and Mitsubishi Electric Automotive America, Inc. are collectively referred to herein as "Mitsubishi" or the "Mitsubishi Defendants."

### AGENTS AND CO-CONSPIRATORS

29.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in

8

2:15-cv-11830-MOB-MKM   Doc # 1   Filed 05/20/15   Pg 9 of 29   Pg ID 9

furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

30.     The acts alleged herein that have been performed by Defendants were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of the Defendants' business affairs.

31.     Each Defendant acted as the agent, principal, or joint venturer of the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

32.     The acts alleged herein that have been performed by DENSO International America, Inc., DENSO Products and Services Americas, Inc., DENSO International Korea Corporation, Diamond Electric Mfg. Corporation, Hitachi Automotive Systems Americas, Inc., Mitsubishi Electric US Holdings, Inc., and Mitsubishi Electric Automotive America, Inc. were authorized, ordered, and condoned by their respective parent companies.

## FACTUAL ALLEGATIONS

### A.  Product Description: Ignition Coils

33.     "Ignition Coils" are devices that are part of a vehicle's fuel ignition system and release electric energy to ignite a fuel mixture.

34.     Ignition Coils are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They also are installed in automobiles to replace failing, defective or damaged Ignition Coils.

35.     Defendants and their co-conspirators supplied Ignition Coils that were: 1) manufactured in the United States and installed in motor vehicles manufactured in the United States or used for replacement parts for motor vehicles in the United States; 2) manufactured abroad, exported to the United States, and installed in motor vehicles manufactured and sold in

the United States; and 3) manufactured abroad and exported into the United States for use as replacement parts for motor vehicles in the United States.

**B. The Ignition Coils Market**

36.     The Ignition Coils market has certain characteristics that are conducive to a price-fixing conspiracy and that make Defendants' conspiracy more plausible, namely there are high barriers to entry and demand for the product is inelastic.

37.     There are substantial barriers to entry in the Ignition Coils market as any new entrant would face costly and lengthy start-up costs, including manufacturing plants and equipment, research and development, transportation, distribution infrastructure, the obtaining of skilled labor, and the existence of long-standing relationships between customers and suppliers. Furthermore, Defendants own multiple patents related to the manufacture of Ignition Coils that further inhibit market entry.

38.     Demand for Ignition Coils is highly inelastic—*i.e.*, sellers of Ignition Coils can increase prices with little or no decline in units sold.  This is because there are no viable substitutes for these products and an Ignition Coil is an essential part of modern motor vehicles (even if prices are kept at a supra-competitive level).

**C. The Request for Quotation Process**

39.     When procuring parts such as Ignition Coils for manufacturing a new motor vehicle, an OEM issues a Request for Quotation ("RFQ").  Automotive parts manufacturers, such as the Defendants, then submit a bid or quotation to the OEM in response to the RFQ.

40.     The RFQ process is designed to obtain competitive, independent bids from multiple suppliers.  To that end, an OEM will issue the RFQ to multiple competing parts suppliers, those suppliers will submit bids, and the OEM will select a winner (usually the lowest

bid).  Sometimes, before selecting the winner, an OEM or the suppliers may revise the technical specifications, and revised bids will be submitted.

41.     The parts purchased by the OEM in connection with that RFQ are purchased from the winning parts manufacturer for the lifespan of the motor vehicle model, which on average is between four to six years.  During that time frame, whenever an OEM purchases Ignition Coils for that motor vehicle model, the OEM purchases the Ignition Coils from the parts manufacturer who won the RFQ and was awarded the supply contract, at the price set by that supply contract.

42.     The prices set by the RFQ process are also used when direct purchasers other than the OEM who issued the RFQ purchase Ignition Coils from the Defendants, such as those purchasing Ignition Coils to replace parts as they become worn or damaged.  Every subsequent purchaser who buys Ignition Coils from that Defendant pays at least the winning price set by the RFQ or higher.

43.     Thus, the RFQ process described above not only sets the prices for Ignition Coils incorporated into new motor vehicles manufactured by that particular OEM, it also sets the price floor for all other direct purchasers, including those making purchases for use as replacement and aftermarket parts.

**D.  Defendants' Ignition Coils Conspiracy**

44.     During the Class Period, Defendants and their co-conspirators engaged in a single conspiracy to raise, fix, maintain, and/or stabilize prices for Ignition Coils by price-fixing, rigging bids for, and allocating the market and customers of Ignition Coils sold in or into the United States.

45.     In furtherance of that conspiracy, Defendants participated in meetings, telephone conversations, emails, and other communications in order to discuss bids and price quotations for

Ignition Coils sold in or into the United States, and agreed to rig bids and allocate the supply of those Ignition Coils.  Defendants then submitted as part of the RFQ process bids and price quotations to the OEMs in accordance with those conspiratorial agreements.

46.     Defendants knew and intended that their conduct would impact not only Ignition Coils sold to the OEMs as a result of the rigged bidding processes, but also the Ignition Coils sold to all direct purchasers throughout the United States.

47.     This was because the conspiracy permitted the Defendants to fix, raise, maintain, and/or stabilize the prices paid by OEMs in order to set a floor for the prices paid by all other direct purchasers of Ignition Coils.

48.     As a result of the conspiracy, OEMs and all or nearly all other direct purchasers of Ignition Coils paid supra-competitive prices for those products.

**E.  Government Investigations and Guilty Pleas**

49.     Government officials in the United States, Europe, Canada, and Japan have been involved in a globally coordinated antitrust investigation for several years involving automotive parts, including Ignition Coils.  The investigation began in Europe after some European OEMs lodged a complaint with the European Commission ("EC").

50.     As a result of this investigation, United States, European, and Japanese authorities executed surprise raids in February 2010 at the offices of several automotive parts manufacturers, including some of the Defendants.  To obtain search warrants for the raids conducted in the United States, the government was legally required to demonstrate probable cause that it would obtain evidence of an antitrust violation as result of executing the warrant— *i.e.*, the United States must have presented sufficient evidence to the magistrate to convince him

or her that a person of reasonable caution would believe that raiding these offices would uncover additional evidence of antitrust violations.

51.    As of the filing of this Complaint, thirty-five (35) companies and twenty-nine (29) executives have pled guilty or agreed to plead guilty as a result of the DOJ's automotive parts investigation, resulting in more than <u>$2.5 billion in criminal fines and dozens of prison sentences</u>.

52.    According to the FBI's Special Agent in Charge Andrew G. Arena, "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."

**Diamond, Hitachi and Mitsubishi Have Pled Guilty to Price-Fixing Ignition Coils**

53.    Defendants Diamond Electric Mfg. Co.., Ltd., Hitachi Automotive Systems, Ltd. and Mitsubishi Electric Corporation have pled guilty to participating in a combination or conspiracy to fix, stabilize, and maintain the prices of Ignition Coils in violation of the Sherman Act.

54.    The respective plea agreements also covered these Defendants' "related entities" or "subsidiaries," including Defendants named in this complaint.  For example, the Hitachi agreement included a promise by the DOJ not to prosecute "any of its related entities [including Defendant Hitachi Automotive Systems Americas, Inc. and the former Hitachi Automotive Systems Group of Defendant Hitachi, Ltd. as it existed prior to July 1, 2009] for any act or offense committed before the date of signature of this Plea Agreement that [] was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of automotive parts[.]"

13

The Diamond agreement also provided that the DOJ would not prosecute "any of its related entities," specifically referencing Defendant Diamond Electric Mfg. Corporation. The Mitsubishi agreement contained a nearly identical provision, except that "related entities" was replaced by "subsidiaries." Similarly, the Hitachi and Diamond agreements provided that the "United States will not bring criminal charges against any current or former director, officer, or employee of the defendant or its related entities for any act or offense committed before the date of signature of this Plea Agreement;" the Mitsubishi agreement contained the same language but for the substitution of "subsidiaries" for "related entities." In addition, the plea agreements required cooperation from these related entities or subsidiaries, as the case may be, and their respective officers, directors and employees.

55. According to separate Informations filed against these Defendants, Diamond Electric Mfg. Co., Ltd., Hitachi Automotive Systems, Ltd., Mitsubishi Electric Corporation, and their co-conspirators carried out their conspiracy by, among other things:

> (a) participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

> (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

> (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of automotive parts [in the case of Diamond, Ignition Coils only] sold to automobile manufacturers in the United States and elsewhere;

> (d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

14

(e)    submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)    selling automotive parts [in the case of Diamond, Ignition Coils only] to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for automotive parts sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices;

(h)    engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)    employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

56.    The Information filed against these Defendants also provided additional details regarding their participation in the conspiracy:

57.    **Diamond:**  On July 16, 2013, the DOJ announced that Defendant Diamond Electric Mfg. Co., Ltd. agreed to plead guilty to participating in a conspiracy regarding Ignition Coils from at least as early as July 2003 until at least February 2010. As part of its guilty plea, Hitachi Automotive Systems, Ltd. agreed to pay a $19 million fine.

58.    On January 31, 2014, the DOJ announced that the former president and vice president of Defendant Diamond Electric Mfg. Co., Ltd., Shigehiko Ikenaga and Tatsuo Ikenaga, respectively, agreed to plead guilty to participating in a conspiracy regarding Ignition Coils from at least as early as July 2003 until at least February 2010. Shigehiko Ikenaga was sentenced to 16 months and ordered to pay $5,000. Tatsuo Ikenaga was sentenced to 13 months and also ordered to pay $5,000.

59.    **Hitachi**:  On September 26, 2013, the DOJ announced that Defendant Hitachi Automotive Systems, Ltd. agreed to plead guilty to participating in a conspiracy regarding certain automotive parts, including Ignition Coils, from at least as early as January 2000 until at least February 2010.  As part of its guilty plea, Hitachi Automotive Systems, Ltd. agreed to pay a $195 million fine.

60.    Hitachi's employees took steps to obstruct the DOJ's criminal investigation into its collusive conduct.  According to its plea agreement, in February 2010, some of Hitachi's employees became aware of a criminal investigation into the automotive parts industry when one of its competitors was searched by United States law enforcement authorities.  Over the next several days, the employees took steps to destroy incriminating evidence.  In addition, in July 2011, certain of Hitachi's employees discovered that Hitachi was being raided by antitrust authorities outside of the United States.  Immediately after learning of the search, those employees took steps to destroy incriminating evidence.  On both occurrences, the evidence destroyed included electronic files and paper documents.  Some of the employees involved in these efforts were Hitachi's senior managers.

61.    Additionally, on September 18, 2014, the DOJ announced a one-count indictment against four executives at Hitachi Automotive Systems, Ltd.—Takashi Toyokuni, Ken Funasaki, Kazunobu Tsunekawa, and Tomiya Itakura—charging them with conspiring to fix prices of various automotive parts, including Ignition Coils, between at least January 2000 and February 2010.

62.    On April 23, 2015, one of the four executives, Takashi Toyokuni, a former manager and director at Hitachi Automotive Systems, Ltd., pled guilty to participating in a

16

2:15-cv-11830-MOB-MKM   Doc # 1   Filed 05/20/15   Pg 17 of 29   Pg ID 17

conspiracy to fix the prices of various automotive parts, including Ignition Coils. He was sentenced to 15 months and ordered to pay $20,000.

63.    **Mitsubishi**:   On September 26, 2013, the DOJ announced that Defendant Mitsubishi Electric Corporation agreed to plead guilty to participating in a conspiracy regarding certain automotive parts, including Ignition Coils, from at least as early as January 2000 until at least February 2010.[1]   As part of its guilty plea, Mitsubishi Electric Corporation agreed to pay a $190 million fine.

64.    Like Hitachi, Mitsubishi also took steps to frustrate the DOJ's criminal investigation into its collusive conduct. According to Mitsubishi's plea agreement, in February 2010, Mitsubishi's employees became aware of a criminal investigation into the automotive parts industry when one of its competitors was searched by United States law enforcement authorities. At that point, the employees took steps to destroy incriminating evidence, including electronic files and paper documents located in both the United States and Japan. These steps were approved by senior managers based in Japan.

65.    On September 18, 2014, the DOJ announced a three-count indictment against three executives at Mitsubishi Electric Corp.—Atsushi Ueda, Minoru Kurisaki, and Hideyuki

---

[1]   According to paragraph 13 of Mitsubishi Electric Corporation's Plea Agreement, the term "[a]utomotive parts" was defined as AC generators, air bag sensors, air bags, air flow sensors, alternators, cam and crank sensors, electric power steering motors, electronic control units, exhaust gas recirculation valves, fuel injectors, fuel pumps, high intensity discharge ballasts, ignition coils, integrated units, keyless entry systems, manifold absolute pressure sensors, purge control valves, starter motors, throttle bodies, variable cam timing, and variable valve timing. The Information filed the same day, however, states that Mitsubishi Electric Corporation and its co-conspirators agreed "to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts, including starter motors, alternators, and ignition coils." It is unclear whether or not this list was meant to be exhaustive or representative (*i.e.*. if the various other parts identified in the Plea Agreement were also subject to the same big ridding, marketing allocation, and price-fixing activities).

17

Saito.  Count one charged all three executives with conspiring to fix prices of various automotive parts, including Ignition Coils, between at least January 2000 and February 2010.  Count two charged Kurisaki and Saito with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents. Count three charged Saito with knowingly and corruptly persuading, and attempting to persuade, executives to destroy documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere.

**DENSO Has Pled Guilty to Price-Fixing Other Automotive Parts**

66.    DENSO has pled guilty to participating in combinations or conspiracies to fix, stabilize, and maintain the prices of other automotive parts in violation of the Sherman Act.

67.    According to Deputy Assistant Attorney General Brent Snyder of the Antitrust Division's Criminal Enforcement Program, "The participants in this conspiracy were not located in just one country or region of the world."  Snyder further stated, "Collusion related to automotive parts was global in nature and our efforts to hold responsible companies and individuals accountable for the resulting harm to U.S. consumers and businesses."

68.    On January 30, 2012, the DOJ announced that Defendant DENSO Corporation had agreed to pay a $78 million fine and plead guilty to a two-count criminal Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units ("ECUs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and until at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts

industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1 .

69.     Defendant DENSO Corporation's subsidiary, Defendant DENSO International Korea Corporation, was a member of the DENSO family that performed manufacturing and/or marketing and sales operations with respect to sales of products to Korean automobile manufacturers.  For DENSO to effectuate the conspiracy to fix prices and rig bids on, among other products, Ignition Coils, Defendant DENSO International Korea Corporation was a designated entity for rigging bids in response to RFQs issued by Korean automobile manufacturers.

70.     According to the criminal Information filed against it, Defendant DENSO Corporation and its co-conspirators carried out the conspiracies by:

(a)     participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to certain automobile and internal combustion engine manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile and internal combustion engine manufacturers;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of automotive parts sold to automobile and internal combustion engine manufacturers in the United States and elsewhere, in some cases on a model-by-model or an engine-specific basis;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile and internal combustion engine manufacturers in the United States and elsewhere;

(e)    submitting bids, price quotations, and price adjustments to certain automobile and internal combustion engine manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)    selling automotive parts to certain automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for automotive parts sold to certain automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and non-competitive prices;

(h)    engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)    employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

## ANTITRUST INJURY

71.    Defendants' conspiracy suppressed price competition among Defendants, causing prices for Ignition Coils to be artificially inflated throughout the Class Period.

72.    As a result, Plaintiff and the members of the Class paid supra-competitive prices for Ignition Coils and were deprived of the benefits of a competitive market throughout the Class Period.

73.    Therefore, as a direct and foreseeable result of Defendants' conspiracy, Plaintiff and the members of the Class have been injured in their business or property in that they paid more for Ignition Coils than they would have in the absence of Defendants' unlawful and anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action both on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3). The Class is defined as follows:

> All individuals and entities that purchased Ignition Coils in the United States directly from one or more Defendants or their co-conspirators (or their controlled subsidiaries, affiliates, or joint ventures) from January 1, 2000 through the present.

75.     Plaintiff does not know the exact number of Class members, such information being in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the members of the Class are so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

76.     There are questions of law or fact common to the Class, including, but not limited to, the following:

(a)     Whether Defendants engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Ignition Coils sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)     Whether the contract, combination, or conspiracy caused Ignition Coils prices to be higher than they would have been in the absence of Defendants' conduct;

(f)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other Class members;

(g)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and other Class members;

(h)     Whether Plaintiff and other Class members are entitled to injunctive relief and, if so, the nature and extent of such relief; and

(i)     The appropriate class-wide measure of damages.

77.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

78.     Plaintiff's claims are typical of the claims of the Class because Plaintiff directly purchased Ignition Coils from one or more of the Defendants and/or their co-conspirators, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiff is common to the Class.

79.     Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a direct purchaser of Ignition Coils and has no conflict with any other members of the Class.   Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

80.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

81.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.   Prosecution of this matter as a class action will eliminate the

possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

82.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

83.     The Class is also readily definable and is one for which records likely exist in the files of Defendants.

### PLAINTIFF'S CLAIMS ARE TIMELY

84.     Plaintiff and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, July 16, 2013.   On that date, the DOJ publicly announced the impending guilty plea of Defendant Diamond Electric Mfg. Co., Ltd.

85.     As a result, Plaintiff and the members of the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein, until July 16, 2013.   Prior to that time, there was insufficient information to suggest that any of the Defendants was involved in a conspiracy to fix prices, rig bids, or allocate the market for Ignition Coils.

86.     Moreover, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the members of the Class until at least July 16, 2013.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the Class Period began.

87.     Defendants' conspiracy, by its very nature, was inherently self-concealing. Moreover, because Ignition Coils are not exempt from antitrust regulation, and because the price for Ignition Coils was set through an RFQ process that Plaintiff and members of the class had

reason to believe was competitive, Plaintiff and the members of the Class reasonably believed they were making Ignition Coils purchases in a competitive industry.

88.    In addition, Defendants took affirmative steps to conceal their conspiracy and carry it out in a manner that would preclude detection.  For example, Defendants have used code names and met in remote locations in order to keep their anticompetitive conduct secret.

89.    One or more of the Defendants have already pled guilty to purposefully destroying evidence to avoid detection.  For example, the Plea Agreement for Defendant Hitachi Automotive Systems, Ltd. states:

> In February 2010, certain employees of the defendant became aware of a criminal antitrust investigation when one of their co-conspirators in the criminal activity described in paragraphs 4(a) – (d) of this Plea Agreement was searched by Federal law enforcement authorities in the United States. Over the next several days, certain employees of the defendant took steps to destroy evidence of the defendant's criminal activity described in paragraphs 4(a) – (d).  In July 2011, certain employees of the defendant learned that the defendant was being raided by law enforcement authorities outside the United States in connection with an investigation into violations of competition laws.  Immediately after learning of the search, certain employees of the defendant took steps to destroy evidence of the criminal activity described in paragraphs 4(a) – (d) to prevent its discovery by law enforcement authorities.  On both occasions, the evidence that was destroyed included electronic files and paper documents.  Certain employees involved in the efforts to destroy evidence were senior managers of the defendant.

Similar admissions were made in the Plea Agreement for Defendant Mitsubishi Electric Corporation.

90.    As described above, several employees of the Defendants have pled guilty to charges of obstruction of justice in which they admitted to deleting, destroying, altering, falsifying and/or concealing records and documents, including emails and electronic files.

91.     Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff and the members of the Class did not learn or discover the operative facts giving rise to this Complaint prior to July 16, 2013.  No information, actual or constructive, was ever made available to Plaintiff and the members of the Class that would have led a reasonably diligent person to investigate whether a conspiracy existed prior to July 16, 2013.

92.     For these reasons, the statute of limitations applicable to Plaintiff and the Class's claims did not begin to run or were otherwise tolled until July 16, 2013.

**CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**(Against All Defendants)**

93.     Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

94.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Ignition Coils sold in or into the United States.

95.     As horizontal competitors, Defendants' agreement, combination, or conspiracy thus constitutes a *per se* violation of the federal antitrust laws.

96.     In accordance with this agreement, combination, or conspiracy, Defendants and their co-conspirators endeavored to and succeeded in rigging bids, allocating the market, and fixing prices for Ignition Coils sold in or into the United States during the Class Period.

97.     In furtherance of their conspiracy, Defendants and their co-conspirators took at least the following affirmative actions:

25

(a) Participated in meetings, conversations, and communications to discuss the bids and price quotations for Ignition Coils to be submitted to direct purchasers in the United States;

(b) Agreed on bids and price quotations for Ignition Coils to be submitted to direct purchasers in the United States;

(c) Submitted bids and price quotations to direct purchasers of Ignition Coils in accordance with the agreements reached;

(d) Manipulated prices and allocated supply of Ignition Coils sold in or into the United States;

(e) Coordinated price adjustments for Ignition Coils sold in or into the United States;

(f) Sold Ignition Coils in or into the United States at supra-competitive prices; and

(g) Actively concealed the true nature of their unlawful conduct from Plaintiff and the members of the Class in furtherance of the conspiracy.

98.     As a direct and proximate result of the conduct described above, Plaintiff and the members of the Class have been injured in their business and property in that they paid more for Ignition Coils during the Class Period than they would have absent the anticompetitive conduct of Defendants and their co-conspirators.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class proposed herein, and respectfully requests the following relief:

A.     That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

26

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.     That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.     That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.     That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.     That Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

27

Dated:  May 20, 2015                          Respectfully submitted,


                                               /s/ Aubrey H. Tobin
                                              Aubrey H. Tobin (P31256)
                                              Attorney at Law, P.C.
                                              2140 Walnut Lake Road
                                              West Bloomfield, MI 48323
                                              Telephone: (248) 932-3070
                                              Aubrey@tobinpc.com

                                              M. John Dominguez
                                              COHEN MILSTEIN SELLERS
                                              & TOLL PLLC
                                              2925 PGA Boulevard, Suite 200
                                              Palm Beach Gardens, FL 33410
                                              Telephone: (561) 515-1431
                                              jdominguez@cohenmilstein.com

                                              David A. Young
                                              COHEN MILSTEIN SELLERS
                                              & TOLL PLLC
                                              1100 New York Ave. NW, Suite 500 West
                                              Washington, D.C. 20005
                                              Telephone: (202) 408-4600
                                              dyoung@cohenmilstein.com

                                              Matthew W. Ruan
                                              COHEN MILSTEIN SELLERS
                                              & TOLL PLLC
                                              88 Pine Street, 14th Floor
                                              New York, NY 10005
                                              Telephone: (212) 838-7797
                                              mruan@cohenmilstein.com

                                              Christopher J. Cormier
                                              COHEN MILSTEIN SELLERS
                                              & TOLL PLLC
                                              2443 S. University Boulevard, #232
                                              Denver, CO 80210
                                              Telephone: (720) 583-0650
                                              ccormier@cohenmilstein.com

Solomon B. Cera
Thomas C. Bright
Pamela A. Markert
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230
scera@cerallp.com
tbright@cerallp.com
pmarkert@cerallp.com